# SUPPLEMENT.

OPINION OF THE JUSTICES TO THE GOVERNOR AND COUNCIL.

Under the Pub. Sts. c. 70, § 2, relating to the appointment of pilot commissioners for Boston Harbor, the Governor and Council can appoint such commissioners without the recommendation of the trustees of the Boston Marine Society only when such trustees fail seasonably to make a recommendation.

A commissioner of pilots for Boston Harbor is an officer appointed by the Governor and Council within the meaning of the St. of 1887, c. 364, relating to tenure of office, although he must first be recommended by the trustees of the Boston Marine Society 'if the trustees are able and willing to make the recommendation, and will continue to hold the office after the term for which he was originally appointed has expired until his successor in office has been duly appointed and qualified.

THE following order was passed by the Governor and Council on December 16, 1891, and transmitted to the Justices of the Supreme Judicial Court, who, on December 31, 1891, returned the answer which is subjoined.

Whereas, a question has arisen before the Governor and Council as to the legality of the appointment of a commissioner of pilots for the harbor of Boston, made in July, 1890, and to the duty of the Governor and Council now to make an appointment to said office, which they have been formally requested to do by the Boston Marine Society in this Commonwealth, a copy of which is annexed; under which circumstances certain important questions of law arise, hereto subjoined, of which an early determination is desirable; it is therefore

Ordered, That the opinion of the Honorable Justices of the Supreme Judicial Court be, and it is hereby, requested as to the law arising upon the following facts.

Under the Public Statutes, chapter 70, section 2, commissioners of pilots for the harbor of Boston are to be appointed by the Governor and Council, "and shall first be recommended by the trustees of the Boston Marine Society," unless they "refuse, decline, or are unable to make the recommendation." A rule adopted by the Executive Council for the regulation of its proceedings, and existing in July, 1890, provides that no nomination shall be acted on by the Council until seven days after it shall have been made; and another rule then existing provides that said rule may be suspended by vote of five members at a regular meeting.

The term of office of Thomas P. Howes, a commissioner of pilots for the harbor of Boston, expired by limitation on July 13, 1890. On the 8th day of said July the trustees of the Boston Marine Society duly recommended for said office of commissioner of pilots (and forwarded such recommendation on the same day) to the Governor and Council, Edwin D. Wadsworth of Milton; and they did not and have not recommended any other person for the successor of said Howes in such office.

On July 1, 1890, the Governor nominated said Howes for the said term, which would begin on the 14th of July, 1890, and at the next meeting of the Council, on the 8th day of said July, the nomination of said Howes was confirmed, the Governor and Council at that time not knowing of the recommendation of said trustees. Said Howes has continued to perform the duties of the office to the present time. The Governor and Council are advised that it is doubtful if the legality of said appointment can be determined by proceedings or information in the nature of *quo warranto*.

And the questions here presented are: —

First. Was Thomas P. Howes, on the above facts, legally appointed in July, 1890, commissioner of pilots for the term beginning July 14, 1890?

Second. Does chapter 364 of the Acts of 1887, relating to certain officers, apply to the pilot commissioners for the harbor of Boston, and if so, with what effect in the case stated?

The copy of the request by the Boston Marine Society, referred to in the order and annexed thereto, was as follows:

" Boston Marine Society, Boston, July 20th, 1891.

" To His Excellency the Governor.   Dear Sir: On the 13th day of July, 1890, the term (of three years) of the office of pilot commissioner for the harbor of Boston, which had been held by Thomas P. Howes, expired.   On the 8th day of the same month (four days before the expiration of said term), the trustees of the Boston Marine Society, pursuant to section 2, chapter 70, of the Public Statutes, duly forwarded to his Excellency the Governor their recommendation of Captain Edwin D. Wadsworth of Milton, for appointment to said office to succeed said Howes; and said trustees have not recommended any other person therefor.   They are advised that no person has been legally appointed thereto, and, except as its duties may be performed by said Howes holding over, the office is now vacant.

" They respectfully ask that their said recommendation may be acted upon, and that said Edwin D. Wadsworth may be appointed to said office.

" Very respectfully yours,

" Luther Fisk, President,

John Humphrey, Secretary, of the

Boston Marine Society."

To His Excellency the Governor and the Honorable Council of the Commonwealth of Massachusetts:

We, the Justices of the Supreme Judicial Court, have considered the questions upon which our opinion was required by an order of the Governor and Council, a copy of which is annexed, and respectfully submit the following opinion: —

The meaning of the Pub. Sts. c. 70, § 2, seems to us to be that the persons to be appointed commissioners of pilots for the harbor of Boston by the Governor, with the advice and consent of the Council, must first be recommended by the trustees of the Boston Marine Society, and that the Governor and Council can appoint said commissioners without such recommendation only when the trustees refuse, decline, or are unable to make a recommendation.   It appears that the trustees actually recommended to the Governor and Council the appointment of Mr. Edwin D. Wadsworth for the term of three years from the expiration of the term of office of Mr. Thomas P. Howes; that

this recommendation was made and sent to the Governor and Council on the eighth day of July, 1890, and that the term of office of Mr. Howes did not expire by limitation until the thirteenth day of said July. We understand that this recommendation of Mr. Wadsworth by the trustees is still before the Governor and Council; that the trustees have never withdrawn it; and that they still ask that it may be acted on.

We are of opinion that the recommendation of Mr. Wadsworth by the trustees was seasonably made; and that the Governor and Council were not authorized to reappoint Mr. Howes under the circumstances stated in the order.

We are also of opinion that the St. of 1887, c. 364, applies to the office of commissioner of pilots for the harbor of Boston. The commissioners are officers appointed by the Governor with the advice and consent of the Council, although they must first be recommended by the trustees of the Boston Marine Society, if the trustees are able and willing to make the recommendation.

We therefore answer the first question in the negative; and the first part of the second question in the affirmative. The effect of the St. of 1887, c. 364, is that Mr. Howes continues to hold the office the term of which expired by limitation on July 13, 1890, until his successor in office has been duly appointed and qualified.

WALBRIDGE A. FIELD.
CHARLES ALLEN.
OLIVER WENDELL HOLMES, JR.
MARCUS P. KNOWLTON.
JAMES M. MORTON.
JOHN LATHROP.
JAMES M. BARKER.

Boston, December 31, 1891.

THE Honorable WILLIAM ALLEN, a Justice of this Court from the fifth day of September, 1881, died at his residence in Northampton on the fourth day of June, 1891. A meeting of the members of the Hampshire Bar was held in Northampton on the twelfth day of September, 1891, at which resolutions were passed, which were presented to the full Court at Greenfield on the fifteenth day of the same month. Before presenting them, William P. Strickland, Esq., addressed the Court as follows:

May it please your Honors: We are here this day in the shadow of a great sorrow and of a great loss. Our eyes grow dim as we look upon this Court and remember that one form endeared to us by the associations of years will be seen here no more, — that one voice is hushed in that silence which we call death.

Mr. Justice William Allen has passed through the valley of the shadow of death, but "the true Light, which lighteth every man that cometh into the world," illumines the pathway of the just from the sepulchre into the opening heavens, and we are comforted. His long, laborious, and useful life on earth is ended, but his work remains; the spirit of his life survives, and the coming years will but serve to increase his reputation, and to demonstrate the worth of his character and the permanent value of his judicial labors.

Judge Allen was an able lawyer and an accomplished jurist; a man of sound learning, of clear and vigorous intellect, of breadth and flexibility of view, of strong sensibilities under firm control, having that refinement and delicacy of feeling which find their natural expression in the silent and pervasive influence of the daily life. The calmness of his demeanor and the winning grace of his speech were indicative of the serenity of his mind and of the gentleness of his nature, but he had a royal will, and maintained its righteous supremacy. Those who knew him in his public life cherished for him a reverent admiration, and those who were admitted to his intimacy realized the depth and tenderness of his friendship.

I cannot forget the circumstances under which I last saw Judge Allen. It was a casual meeting on a city street; his face was radiant with the hope of returning health, and radiant with an unspoken affection. There was the utterance of a few kindly words and the unconscious pathos of a last farewell.

There remained for him a few days of preparation for active work, — a night of weariness and of quiet endurance, — and in the early morning of a summer day, in his own home, with his loved ones near, he fell asleep, and awaked to find himself forevermore at home.

> "It is not death to die,
> To leave this weary road,
> And 'mid the brotherhood on high
> To be at home with God."

In behalf of the Hampshire Bar, I present these resolutions, with the request that they may be entered upon the records of the Court.

Mr. Strickland then presented the following resolutions:

The members of the Hampshire Bar, deeply conscious of the loss sustained by this State in the death of the Honorable William Allen, late an Associate Justice of the Supreme Judicial Court, desire to express their appreciation of his services and worth.

Resolved, That in the practice of his profession at the Hampshire Bar with associates who were masters of the law and leaders of men, by his native powers, by severe study, by a chivalric devotion to his profession, by an affectionate regard for his brethren, and by a rare fidelity to the courts and to his clients, he secured and easily maintained a prominence which assured his future success and his enlarged usefulness.

Resolved, That as a Justice of the Superior Court his practical sagacity, quick insight, minute and varied knowledge, and aptitude in the application of principles, were called into constant exercise, and illustrated the extent and variety of his powers.

Resolved, That as a Justice of the Supreme Judicial Court

he exhibited the qualities of an accomplished jurist. He possessed a clear and calm mind, and the objects of his thought were sharply outlined and defined. He had a scientific knowledge of the law, and saw its principles grouped in their right relations. He grasped the essentials and escaped the confusion of legal speculation. He was critical in his perceptions, and gifted with subtlety of discernment and with analytic skill. He severely scrutinized facts, and assigned to each its place. He had the habit of patient investigation, and pursued his investigations to fixed and ultimate results, and in the conscientious discharge of duty he spared not himself. He was patient of opposition, but firm in his beliefs, self-reliant, and conscious of the resources which were ever at his command. He listened to counsel with a sincere and unfailing courtesy. His familiarity with logical reasoning and his mental energy enabled him to reach conclusions without display and without waste of power.

In his written opinions legal propositions were distinctly enunciated, and their applications to the facts of an individual case were stated with severe simplicity. The precision of his thought and the felicity of his language settled the law, and neither invited nor permitted further controversy.

The purity of his character, the elevation of his thought, the sweet seriousness of his disposition, his benignity and grace of manner, and the delicacy of his sympathy, gave a peculiar charm and fascination to his personal presence, and partially revealed the strength and depth of his hidden life, — the spiritual life of one " dwelling in the secret place of the most High, and abiding under the shadow of the Almighty."

Resolved, That we express our heartfelt gratitude that this memorable life has been so long spared, that its work so faithfully done is imperishable, and that its spirit survives for our instruction and for our inspiration.

John C. Hammond, Esq., then addressed the Court as follows :

May it please your Honors : Recurring occasions like this remind us that, though we love to pause and render a tribute to the dead, we are almost like soldiers, — under orders to close up the ranks and move on. But at this hour we can pause and

allow ourselves the sad though highly prized privilege of memorial words.

We who count ourselves as still in the vigor of life turn with brief but loving words to the character of Judge William Allen, whose life so suddenly closed. I first knew him when he was in the full practice of his profession at the Hampshire Bar, in 1868. He has outlived all the men who then bore the burden of active work at that Bar. He was the last survivor of the five lawyers then, and for years before, prominently identified with the practice of the law in that county, — William Allen, Samuel T. Spaulding, Charles Delano, Edward Dickinson, and Ithamar F. Conkey. The last two had other duties, and were less often seen in the court-room than were Allen, Spaulding, and Delano, who were active in all the cases then before the courts. Each of the five a man of dignity and culture ; each possessed characteristics peculiarly his own ; each gave to every cause force, originality, and vigor, presenting to us, who were then learners, a high ideal of the profession to which as students and beginners we aspired.

I recall the remarkable force of Lawyer William Allen's addresses to the jury. Under and through a quiet manner there appeared a vigor of thought, a force of illustration, and a persuasiveness truly eloquent. Again I recall him as he sat in his office when some message or business from another office took me there. The genial courtesy of the kindly gentleman quickly removed all sense of being a stranger, and made me feel that he was ready to count beginners among his friends. It made an impression so pleasant, it was an influence so helpful, that I cannot refrain from its mention to-day.

Through all the contests of the court-room he remained the fast friend of his brethren at the bar. When he left his practice and assumed the duties of the judicial office, we who best knew him knew as a certainty that a man well fitted had been selected.

His gentleness of manner connected itself with a decision and force fully appreciated by those who heard him address a jury, and equally appreciated as we have seen him in his work in the higher places to which he was called.

Only a few days before his death, two of us were before him

on a brief errand at his house, and after the errand was done he held us in pleasant conversation for nearly an hour upon current events of the city of his home, showing his great and unabated interest in all things of interest to Northampton, though he was able to mingle little in its affairs. The next word which came to us was of his sudden death. The whole community in which he lived mourned for her most honored citizen. May we take counsel of this life. May we so live that we may be thus beloved.

Chester C. Conant, Esq., then addressed the Court as follows:

May it please your Honors: In behalf of my brethren of the Franklin County Bar, I rise to second the resolutions offered by Mr. Strickland for the Hampshire County Bar. They are fitting and eloquent, and we concur in the sentiments so gracefully expressed.

This county was once a part of old Hampshire, and the courts of the two counties have ever had more intimate relations, and closer connections, I suppose, than other counties in the Commonwealth.

Judge William Allen was often here in important trials as a practitioner before he was promoted to the bench. His power as a lawyer before the court and jury was well known, and often felt by some of us. In his contests we always felt that he was ever fair and honorable; and however hard the blows he dealt, we all knew there never was any sting of bitterness in them. It is one of the happy features of our noble profession, that in the course of exciting trials we can deal and receive sharp and vigorous strokes in such an impersonal manner that no wounds are left after the fierce contest is over.

As a trial judge in the Superior Court, we call to mind to-day his uniform courtesy in the trial of causes; he could rule adversely with firmness, and even graciously. His sound common sense and great sagacity in the practical affairs of life, combined with profound knowledge of law and unbending integrity and kindness of heart, made him always a welcome judge in this county. He was held in the highest respect and reverence, and is to-day most sincerely mourned by those who knew him best.

Judge Allen was happy in his ancestry. As I have stood before the faithful portrait of President Eleazer Wheelock, in the Dartmouth College portrait gallery, it has seemed to me that I could trace a marked resemblance between the lineaments of Judge Allen and the face of that wonderfully able man, who, one hundred and twenty-five years ago, in an unbroken wilderness laid deep and strong the foundations of that honored institution which has been such a power for good in New England. The abundant gray hair and beard of Judge Allen emphasized his resemblance to President Wheelock, as the latter is painted in the full-bottomed wig of those times. The likeness is remarkable. It seems to me that, as in features, so we can trace the resemblance in mind and heart. President Wheelock was a great man, — so full of practical sagacity in the common affairs of life, so wise and good, so fertile in expedients, and so successful in the accomplishment of his great undertakings. In Judge Allen we find repeated in full vigor these characteristics of the honored President of Dartmouth.

It might have been expected that the lineal descendant of such men as Eleazer Wheelock of Dartmouth, and President Allen of Bowdoin, would be distinguished, but it was Judge Allen's rare good fortune to exceed even such expectations.

The Attorney General then addressed the court as follows:

Your Honors: I willingly avail myself of the invitation of my brethren of the bar of this circuit to add my testimony to the worth and value of Judge Allen's character and public service. I am confident that the bar of that part of the Commonwealth in which I live would not desire me to sit by without some expression of the feeling which they fully share with his neighbors and friends of the western counties.

From a memorandum which has been put into my hand, I learn that Judge Allen was born at Brunswick, Maine, in 1822, and that at the age of sixteen he entered Bowdoin College, of which his father was then President, but completed his course at Amherst, graduating there in 1842. Three years later he was admitted to the bar in Northampton, and there he practised law for twenty-seven years. This brief statement seems to embody his history to the time of his appointment to the bench.

He was of an ancestry which pointed to great things, — son of a President of Bowdoin, grandson through his mother of a President of Dartmouth, and grandson through his father of Thomas Allen, the "fighting parson" of Bennington fame. But while he was called to many honorable positions of private trust, he never engaged in public affairs or held a public office until he was appointed a Judge of the Superior Court, in 1872. He was raised from that position to the bench of this Court in 1881, and here remained until his death, June 4, 1891, which terminated a period of judicial service longer than the average of these times, and long enough to win for him a high place in the public esteem.

He was a stranger to us in the East when he came upon the bench, but coming from that part of the Commonwealth which at one time within our memory was represented in this Court by Chapman, Colt, and Wells, we naturally expected much of him. I do not need to say how the anticipation was fulfilled. He had qualities which instantly commended him to the favor of the bar. Though not courtly, he was courteous, and he was a listener whom nothing seemed to tire. But I think it was not until his elevation to this Court that the whole breadth and power of his mind were displayed, in his written opinions, of some of which it is not too much to say, that in clearness of statement and close and consecutive reasoning they approach the highest level of the Court.

We were unable to see much of Judge Allen in private life, but we learned in time that beneath his impassive exterior the social virtues flowed in a full and abundant stream. I cannot forbear to allude to his striking presence. The picture of that tranquil face and figure, snow-crowned and venerable, like a patriarch or prophet on a canvas of Raphael, is before us as we speak of him, and it will not soon be forgotten. And as he was distinguished from common men in appearance, so was he in character. Quiet and unassuming, but inflexible in his convictions and "heedless of praise or blame" in the discharge of duty, he worthily paid to the community the debt of public service and private example, and he leaves to his friends and associates the memory of one above whose grave may be truly written, *Integer vitæ scelerisque purus.*

Mr. Justice Holmes responded as follows:

Gentlemen of the Bar: When I heard the sudden news of our associate's death, my second thought was that the Commonwealth had lost a judge not to be replaced, — my first was that I had lost a friend.

The Judges of this Court are thrown so much and so closely together by their work, that they are intimate with one another perforce; and to be intimate with William Allen was necessarily to love and admire him. The bar found him very silent upon the bench. He was not so in the consultation-room. There he expressed himself freely, and at times, notwithstanding his quiet manner, with the warmth of a hearty and somewhat impulsive temperament, so that there was no question that we knew not only his opinions, but the man behind them.

He seemed to me a typical New Englander, both in character and in ways of thinking; a characteristic product of one of those inland towns which have been our glory, — centres large enough to have a society and a culture of their own, and, formerly at least, remote enough to have local traditions, and local rather than cosmopolitan standards and responsibilities. As with others whom I have known that were brought up in similar surroundings, his Yankee caution and sound judgment were leavened with a touch of enthusiasm capable of becoming radical at moments, and his cultivation had destroyed rather than fostered his respect for the old merely as such. He was very kind. He was always perfectly considerate and reasonable, as well as warm of feeling. In ill health as in good, he took his share of work without a word or hint of what it cost him until he died. He had the subtlety of a Calvinist theologian, and as sound a training in the common law as was to be found in Massachusetts; but he was saved from becoming over technical by his good sense, his humanitarian turn, and the occasional slight touch of radicalism which I have noted. I never felt quite sure that nothing had been overlooked in a statement of facts, until his eye had scrutinized it. In discussion, if you did not agree with him, you always reached an exact issue, and escape in generalities was impossible. I know few qualities which seem to me more desirable in a judge of a court of last resort than this accuracy of thought, and the habit of keeping one's

eye on the things for which words stand. Many men, especially
as they grow older, resent attempts to push analysis beyond con-
secrated phrases, or to formulate anew. Such attempts disturb
the intellectual rest for which we long. Our ideal is repose,
perhaps because our destiny is effort, just as the eye sees green
after gazing at the sun. Judge Allen had none of this weak-
ness, but went on without rest to the end.

Great places make great men. The electric current of large
affairs turns even common mould to diamond, and traditions of
ancient honor impart something of their dignity to those who
inherit them. No man of any loftiness of soul could be long a
Justice of this Court without rising to his full height. But our
dead brother seemed to me too modest to be ambitious for repu-
tation, and to regard his place mainly as an opportunity and a
duty. He would have been most pleased, too, I dare say, to
slip from it and from life, when his hour came, without remark.
He would have preferred not to be celebrated with guns and
bells and pealing requiems, the flutter of flags and gleam of
steel in the streets, and all the pomp which properly is spent
on those who have held power in their right hand; which ne-
cessarily and rightly was spent on another honored and beloved
member of this bench, who had added a soldier's to a jurist's
career. I too am content for him that it should be so, if this
neglect of outward show means, even for a chosen few, that
their eyes have taken a wider sweep, and have seen that such
symbols do not express the vast and shadowy command which
a thinker holds. Our prevailing ideals are somewhat coarse.
Comparatively few imaginations are educated to aspire beyond
money and the immediate forms of power. I have no doubt
that vulgar conceptions of life at the top are one of the causes
of discontent at the bottom of society. Unless we are to accept
decadence as the necessary end of civilization, we should be grate-
ful to all men like William Allen, whose ambition, if it can be
called so, looks only to remote and mediated command; who do
not ask to say to any one, Go, and he goeth, so long as in truth-
ful imagination they wield, according to their degree, that most
subtile and intoxicating authority which controls the future
from within by shaping the thoughts and speech of a later
time.

Such men are to be honored, not by regiments moving with high heads to martial music, but by a few others, lonely as themselves, walking apart in meditative silence, and dreaming in their turn the dream of spiritual reign.

The resolutions of the Bar were ordered to be entered upon the records of the Court; and the Court then adjourned.